# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| A DARK BLUE SAMSUNG SMART PHONE WITH A CRACKED SCREEN THAT WAS SEIZED FROM CENTER CONSOLE OF A BROWN GMC PICKUP TRUCK, BEARING CALIFORNIA LICENSE PLATE 7N12554 AND REGISTERED TO A.M.S., ON NOVEMBER 21, 2019 | ) |

Case No.

2:19MJ5078

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute |
| 18 U.S.C. § 924(c) | Carrying a Firearm in Relation to a Drug Offense |
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm or Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kevin Currie, Task Force Officer

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/23/19

*Judge's signature*

City and state: Los Angeles, CA

Hon. Gail J. Standish, U.S. Magistrate Judge

*Printed name and title*

AUSA: Scott D. Dubois (x0882)

## AFFIDAVIT

I, Kevin Currie, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against JOSE REYES ("REYES"), aka Martin Mendez-Ayala, for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.    This affidavit is also made in support of an application for a warrant to search a digital device (the "SUBJECT DEVICE"), in the custody of Los Angeles Police Department, in Los Angeles, California, as described more fully in Attachment A, which is incorporated herein by reference.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  **BACKGROUND OF AFFIANT**

5.   I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation, South Bureau Violent Crime Task Force, and I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7) empowered to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in section 2516 of Title 18 of the United States Code.  I am also a police officer for the Los Angeles Police Department ("LAPD") and have been so employed since July of 2001.  I am currently assigned to Operations South Bureau.  During my employment, I have received training from the Los Angeles Police Academy and California Narcotics Officers Association on the subject of narcotics; including the recognition of various drugs, their methods of use, sales, packaging for sales, transportation for distribution, and manufacturing.  I attended the Los Angeles Police Department's Academy, Narcotics School and Drug Recognition Expert School.  I have also attended classes through the California Narcotics Officers Associate for; cocaine and heroin, Oxycodone, Butane Hash Oil, methamphetamine, Opioids, marijuana and drug trends.

6.    Additionally, I have worked Narcotics Units in different areas within the city of Los Angeles for over six years and I have observed the way drugs were manufactured, transported, sold, packaged, and consumed.  During my time as an investigator, I worked and conferred with experienced officers in narcotics law enforcement and have drawn from their knowledge and experience in the field of narcotics investigations.  I have trained newer Officers about the narcotics trade and in the identification of drugs.  During my tenure, I have been involved in over 800 narcotics-related investigations, including the unlawful possession with intent to distribute, and distribution of controlled substances.  Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I have become familiar with some of the tactics and methods used by narcotic traffickers to smuggle and safeguard narcotics, to manufacture and distribute narcotics, and to collect and launder the proceeds from the sale of controlled substances, including their use of vehicles and firearms.  I am also aware of some of the tactics and methods employed by major narcotics organizations to thwart investigation of their illegal activities.

### III.  SUMMARY OF PROBABLE CAUSE

7.    The FBI conducted two controlled buys involving REYES. On October 28, 2019, REYES sold an AR-15 style assault rifle to a Confidential Human Source ("CHS") working with the FBI.[1]

---

[1] The CHS has no prior convictions and has agreed to cooperate with the FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives in exchange for monetary compensation.

Subsequently, REYES and the CHS arranged a second controlled purchase in which the CHS would provide Oxycodone and $4,000 in exchange for five pounds of marijuana, and REYES would throw in a handgun for free.  On November 21, 2019, REYES appeared at the pre-arranged meeting time and location driving a truck with approximately 10 pounds of marijuana and with a loaded 9mm semi-automatic Glock pistol on his person.  LEONEL ORTIZ ("ORTIZ") arrived with REYES, riding in the front passenger seat.  Police later found a FEG semi-automatic handgun in plain view on the front passenger floorboard of REYES's car.

## IV. **STATEMENT OF PROBABLE CAUSE**

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    October 28, 2019 Controlled Gun Buy**

9.    During the month of October, an unknown individual in Mexico, who law enforcement suspects is part of a drug trafficking organization, put REYES, known to the CHS as "Chuy," in contact with the CHS as a buyer of firearms and narcotics. On October 17, 2019, the CHS informed LAPD that she had negotiated with REYES the purchase of a rifle and a sample of cocaine in exchange for $800.  LAPD directed the CHS to arrange the deal, which was done through text messages and phone calls. These communications were in Spanish, and were translated for me in summary by LAPD Detective Avila, a department certified Spanish speaker.

10.   On October 28, 2019, LAPD set up surveillance in a Denny's parking lot at 530 Ramirez Street.  Officers checked the CHS for contraband and firearms with negative results, outfitted the CHS with an audio/video recording device, and provided the CHS with $800.

11.   Officers on surveillance saw the CHS arrive in the parking lot and sit in his/her car.  The CHS then called REYES to inform him of his/her location.  Approximately 20 minutes later, REYES called and advised the CHS that he would be arriving in a grey Nissan Frontier pickup truck. Approximately five minutes after the call, officers saw a grey Nissan Frontier pickup truck with California license plate 8278D2, registered to E.E.S., park in the Denny's lot.

12.   A white woman, who has not been identified and who looked approximately 35 years old, got out of the pickup and walked over to the CHS, a Hispanic man who appeared roughly the same age appeared from the front of the Denny's.  The man identified himself as "Chuy," and police later identified him as REYES based on his fingerprints and information that he later provided, as described below.  The driver of the grey pickup, an unidentified white man, who appeared approximately 55 years old, drove the truck next to the CHS's car.  According to the CHS, REYES indicated that the woman was his girlfriend and that the man was her cousin.  The CHS, REYES, and REYES's companions stood outside the vehicles talking, then the woman got a brown nylon bag from the front of the pickup and put it in the rear seat of the CHS's car.  The CHS and REYES sat in the CHS's car,

and his companions sat in the pickup.  According to the CHS, REYES said that he would only charge $700 for the rifle because he did not have the sample of cocaine.  These statements were also overheard and translated by Detective Avila.  The CHS and REYES discussed additional firearms purchases, as well as the sale of cocaine and heroin.  Afterward, REYES got back into the pickup and left.

13.  The CHS drove back to LAPD Central Station monitored by LAPD detectives.  At the station, officers took custody of the brown nylon bag, which contained a .223-caliber, AR-15 style assault rifle with no serial number.  The bag also contained four .223 caliber rounds, loaded into a magazine that was not affixed to the firearm.

**B.  November 21, 2019 Controlled Drug and Gun Buy**

14.  LAPD directed the CHS to arrange a second controlled deal, which the CHS did by text messages and phone calls.  These communications were in Spanish and were translated for me in summary by Detective Avila.

15.  On November 21, 2019, LAPD set up surveillance in the same Denny's parking lot used for the October controlled buy.  Officers checked the CHS for contraband with negative results and outfitted the CHS with an audio/video recording device.

16.  At approximately 6:20 p.m., REYES arrived driving a brown GMC pickup truck with California license plate 7N12554 and registered to A.M.S., and he parked next to the CHS's car.  REYES stood outside the truck, and the CHS left the Denny's and walked toward REYES.  The CHS and REYES walked to the passenger

side of the pickup.  ORTIZ, who was in the front passenger seat, got out and stood near the back of the pickup.  After several minutes, the CHS walked back into the Denny's and gave the signal that REYES had brought drugs and a firearm.  According to the CHS, REYES showed him/her the marijuana and a handgun wrapped in a black jacket.

17.  REYES and ORTIZ reentered the truck, then uniformed police officers arrived and ordered the men out of the vehicle. Officer Lopez saw ORTIZ reach toward the floorboard on the passenger's side before he got out of the truck.  On the passenger's side floorboard, officers found an FEG model PA-63, 9mm semi-automatic pistol, bearing serial number BG3093.  In REYES's waistband, officers found a Glock model 1587-07, 9mm semi-automatic handgun, bearing serial number BHTY887, that was loaded with 16 rounds of assorted 9mm ammunition.  In the driver's side door, officers found approximately $1,307 in cash and a baggie containing suspected marijuana that weighed approximately five grams (including packaging).  Officers found approximately 10.56 pounds of suspected marijuana (including packaging) wrapped in ten clear plastic bags that were divided between a black suitcase on the back seat of the truck and a plastic bag on the rear floorboard.  The SUBJECT DEVICE was in the truck's center console.

18.  I examined the suspected marijuana found in REYES's vehicle and based off the odor, texture, appearance, and my training and experience, I determined that it was marijuana.

### C.   REYES's Statements

19.   REYES and ORTIZ were arrested at the scene.   ORTIZ declined to speak with the police, but REYES agreed to speak in a recorded interview after being read and acknowledging his Miranda rights.   The interview was conducted in English.

20.   REYES stated that he had known the CHS for approximately one and a half years, and that he was at the Denny's to trade a firearm to the CHS in exchange for approximately 200 Oxycodone pills.   REYES stated that the FEG pistol belonged to ORTIZ, on whose behalf REYES was conducting the transaction.   REYES claimed that ORTIZ had found the FEG pistol and that REYES agreed to pay ORTIZ $250 after the transaction with the CHS was complete.   REYES claimed that he had never sold the CHS a firearm before, but admitted having sold a firearm in the past.

21.   REYES stated that he intended to sell the marijuana for $800 per pound to a contact that he planned to meet at a Greyhound bus station.   REYES further stated that the same person who supplied the marijuana also gave him the Glock pistol for protection.

22.   REYES acknowledged that the SUBJECT DEVICE belonged to him.   He further stated that he was on federal supervision for narcotics and unlawful entry into the United States.   I confirmed his unlawful re-entry conviction via federal databases.

### D.   Criminal History

23.   On November 21, 2019, I reviewed criminal history reports for REYES and under the name "Martin Mendez-Ayala," an identity with the same FBI number as REYES and which I believe to be an alias used by REYES.  I learned that REYES has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about January 24, 2006, possession of a controlled substance for sale, a violation of California Health and Safety Code Section 11378, in the Superior Court for the State of California, County of Los Angeles, Case Number NA068728;

b.   On or about November 29, 2007, distribution of a controlled substance, in the District Court of the State of Colorado, Case Number D0212007CR003452; and

c.   On or about October 1, 2010, unlawful re-entry into the United States, in the District of Colorado.

### E.   Interstate Nexus

24.   The gun found in REYES's waistband on November 21, 2019, was a Glock pistol with serial number BHTY887.  I examined the Glock pistol, and, based on my training and experience, it appears to be an authentic Glock handgun.  I also know that Glock does not manufacture any pistols within the State of California.  Because the pistol was found in California, I believe that it has traveled in and affected interstate commerce.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

25.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their cell phones and other digital devices.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

    26.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

        b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

27. As used herein, the term "digital device" includes the SUBJECT DEVICE.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

30.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.     CONCLUSION

31.   For all of the reasons described above, there is probable cause to believe that REYES has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A and will provide evidence of the Target Offenses.

Kevin Currie, Task Force Officer
Federal Bureau of Investigation

Subscribed to and sworn before me this 23rd day of November, 2019.

HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The property to be searched is a dark blue Samsung smart phone with a cracked screen that was seized from center console of a brown GMC pickup truck, bearing California license plate 7N12554 and registered to A.M.S., on November 21, 2019, and is currently maintained in the custody of the Los Angeles Police Department in Los Angeles, California as Item 16 under DR No. 19-0126104 (the "SUBJECT DEVICE").

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which relate to the above-named violations;

d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition were bought, sold, or otherwise distributed;

e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, guns, or ammunition;

f.   Contents of any calendar or date book;

g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations at any time and particularly on or about October 28, and November 21, 2019; and

h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine

v

whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

v

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.